**NOT RECOMMENDED FOR PUBLICATION**
File Name: 20a0374n.06

**No. 18-2432**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Jun 24, 2020
DEBORAH S. HUNT, Clerk

BRYAN RICHARDS,

     Plaintiff-Appellee,

v.

COUNTY OF WASHTENAW, et al.,

     Defendants,

JUSTIN BERENT,

     Defendant-Appellant.

)
)
)
)
)
)
)
)
)
)
)

ON APPEAL FROM THE
UNITED STATES DISTRICT
COURT FOR THE EASTERN
DISTRICT OF MICHIGAN

Before: BOGGS, BATCHELDER, and DONALD, Circuit Judges.

BOGGS, Circuit Judge. Justin Berent, a security officer at the University of Michigan, arrested Bryan Richards and the Washtenaw County, Michigan prosecutor charged Richards with one misdemeanor count of assault and battery and two felony counts of assaulting or obstructing a police officer and a medical first responder. A jury acquitted Richards of all charges. Richards filed a 42 U.S.C. § 1983 suit against Berent, as well as Washtenaw County and two Washtenaw County officers—Sergeant Thomas Arnett and Deputy John Cratsenburg—who were involved with his arrest. Richards alleged: (1) Fourth Amendment violations for unreasonable search and seizure (Count I); (2) Fourth Amendment violations for excessive force (Count III); (3) Fourth Amendment violations for malicious prosecution (Count IV); and (4) state-law claims for false arrest/imprisonment and malicious prosecution (Counts II, V). With eight months remaining for the parties to conduct discovery, Berent moved for summary judgment, asserting qualified

immunity. The district court denied the motion, noting that it was influenced by Berent's decision to file the motion so early. Berent now appeals.

Richards has gone through a criminal trial. The summary-judgment record contains the trial transcript, which includes Richards's sworn testimony, as well as that of four witnesses who had direct contact with the events surrounding Richards's arrest. Based on Richards's prior sworn testimony, we affirm the district court's ruling on count III, but reverse as to counts I, II, IV, and V.

## I. Background

On October 1, 2016, Richards was in Ann Arbor with a group of friends to attend a University of Michigan football game. At the time, Richards was 46 years old, 5'11" tall, and weighed 300 lbs. Prior to the game, he consumed at least five 12-ounce beers between 12:30 PM and 2:45 PM. A little before 3:30 PM—the scheduled start time for the game—the group proceeded to the stadium on foot. Richards suffers from arthritis in his left ankle, so he put his arms around his friends for support. Inside the stadium, Richards's friends continued to support him as the group walked to their seats. It was then that UM police officers approached the group and asked Richards if he was drunk. He denied being drunk, but the officers gave him an ultimatum: He could either go to the stadium's emergency medical area or be arrested. Richards agreed to go to the medical area. He was then strapped onto a motorized cart and transported to the medical area, which was located near Gate Nine of Michigan Stadium.

At the medical area, Richards was placed on a gurney with steel railings on both sides. He was offered, but refused, a breathalyzer test. He complied for "[p]robably about 15 minutes" with tests and questions from the medical staff, but then decided to leave. While he was scooting to the end of the gurney, Paramedic Rick Johnson "shoved" him back, telling him that he could not leave

because he was drunk, to which Richards replied, "I'm not drunk." Richards continued scooting off the gurney during this exchange, and when he stood up, Paramedic Johnson "grabbed" his "right arm by the bicep" and would not let go, even as Richards tried to pull away. After "probably less than ten seconds" of this, someone—Richards's testimony gives no indication that, until this point, anyone other than Paramedic Johnson and a nurse were in the medical area—grabbed Richards by the left arm, twisting it behind him and bending him over, and someone else then jumped over Richards's head onto his back, causing Richards to fall to his hands and knees. Richards was later able to identify these two individuals as Officer Berent and Deputy Cratsenburg. While he was on the ground, the officers continued "jumpin' up and down on" Richards until he was flat on the floor with his "hands pinned underneath" him. The entire incident—from his first encounter with Johnson until he was pinned on the ground—took "maybe 20, 25 seconds."

Once he was on the ground, the officers told Richards to "stop resisting" and to put his hands behind his back but he could not comply because his hands were pinned underneath him. After the officers "let up a little bit," Richards rolled over so that he could be handcuffed. The officers told him he was under arrest for "public intoxication" and took him to a separate holding area where he realized he was bleeding from cuts on his head. Richards told the officers that they were "gonna' get sued" and asked why they could not have just told him to put his hands behind his back before taking him to the ground.

Berent concedes that he was the first officer to respond and immediately "grabbed [Richards's] left arm" in an attempt "to place [Richards] under arrest." Deputy Cratsenburg concedes that, when he arrived at the medical area, he joined the officers who took Richards to the ground. While Berent and Cratsenburg "took [Richards] down to his knees," Arnett "assisted by

taking control of [Richards's] legs and helping place him in a prone position" to be handcuffed. None of the officers told Richards that he was under arrest.

The Washtenaw County prosecutor charged Richards with one count of misdemeanor assault and battery, and two felony counts of assaulting or obstructing a police officer and a medical first responder. At trial, Paramedic Johnson and the three officers testified for the prosecution. Richards testified in his own defense, under oath and threat of perjury, and was subject to cross examination. The jury acquitted Richards of all charges, which suggests that they believed Richards or disbelieved the officers, or—at a minimum—that they did not believe the officers beyond a reasonable doubt. Richards filed the instant § 1983 suit in the federal district court and Officer Berent, alone, moved for summary judgment based on qualified immunity. The district court denied the motion, leading to this interlocutory appeal.

## II. Jurisdiction and Standard of Review

Qualified immunity shields government officials in the performance of discretionary functions from standing trial for civil liability unless their actions violate clearly established rights of which a reasonable official would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). A plaintiff who brings a § 1983 action against such an official bears the burden of overcoming the qualified-immunity defense. *Bunkley v. City of Detroit*, 902 F.3d 552, 559 (6th Cir. 2018). At the summary-judgment stage, the plaintiff must show that (1) the defendant violated a constitutional right and (2) that right was clearly established. *Ibid.* In so doing, the plaintiff must, at a minimum, offer sufficient evidence to create a "genuine issue of fact"; that is, "evidence on which [a] jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

If the district court finds that the plaintiff's evidence could support a jury's finding that the defendant violated a clearly established right, the court must deny summary judgment. *DiLuzio v.*

*Vill. of Yorkville*, 796 F.3d 604, 609 (6th Cir. 2015). As the denial of summary judgment is ordinarily not a final decision within the meaning of 28 U.S.C. § 1291, it is generally not immediately appealable. But the "denial of a claim of qualified immunity, to the extent that it turns on an issue of law, is an appealable 'final decision' within the meaning of [] § 1291 notwithstanding the absence of a final judgment." *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985).

When presented with an interlocutory appeal from the denial of qualified immunity in which legal and factual challenges are confused or entwined, "we must separate an appealed order's reviewable determination (that a given set of facts violates clearly established law) from its unreviewable determination (that an issue of fact is 'genuine')." *Roberson v. Torres*, 770 F.3d 398, 402 (6th Cir. 2014) (citing *Johnson v. Jones*, 515 U.S. 304, 319 (1995)) (quotation marks omitted). We likewise separate an appellant's reviewable challenges from the unreviewable ones. *DiLuzio*, 796 F.3d at 610; *see also Romo v. Largen*, 723 F.3d 670, 674 & n.2 (6th Cir. 2013) (accepting appellate jurisdiction by ignoring the "factual disputations" and "ruling on what [wa]s properly before us [while] say[ing] nothing about what [wa]s jurisdictionally not before us"). That is, we must "ignore the defendant's attempts to dispute the facts and nonetheless resolve the legal issue, obviating the need to dismiss the entire appeal for lack of jurisdiction." *Estate of Carter v. City of Detroit*, 408 F.3d 305, 310 (6th Cir. 2005) (deciding based on the plaintiff's record facts). Upon ignoring the defendant's attempts to dispute the facts, we follow the same path as did the district court—considering the sufficiency of the plaintiff's proffered evidence, drawing all reasonable inferences in the plaintiff's favor, and we need look no further than the district court's opinion for the pertinent facts and inferences. *DiLuzio*, 796 F.3d at 611.

Ultimately, we must make the legal determination of whether the defendant violated a clearly established right based on the now (for this purpose) undisputed record facts, i.e., "once

we have determined the relevant set of facts and drawn all inferences in favor of the nonmoving party to the extent supportable by the record." *Scott v. Harris*, 550 U.S. 372, 381 n.8 (2007). In the instant case, we can accept Richards's version of events—as he presented it in his sworn testimony during his state-court criminal trial—as the "undisputed" record facts of this case.

### III. Discussion

#### A. Unreasonable Seizure/False Arrest (Count I)

Ordinarily, an assessment of whether an officer is entitled to qualified immunity after a plaintiff has alleged an illegal arrest requires determining whether there was probable cause for the arrest. Probable cause exists if the "facts and circumstances within [an officer's] knowledge and of which [he] had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [arrestee] had committed or was committing an offense." *Beck v. Ohio*, 379 U.S. 89, 91 (1964). At the summary-judgment stage, all reasonable inferences are to be made in favor of the arrestee, but "an arresting agent is entitled to qualified immunity if he or she could reasonably (even if erroneously) have believed that the arrest was lawful, in light of clearly established law and the information possessed at the time." *Harris v. Bornhorst*, 513 F.3d 503, 511 (6th Cir. 2008). But at the present stage of this case—the interlocutory appeal from the denial of the officer's claim of qualified immunity—the question for us is not the broad question of whether Berent had probable cause to seize Richards, but rather the narrow question of whether Richards has produced evidence upon which a reasonable juror could find that Berent's (even mistaken) seizure of him was necessarily unreasonable under the those facts.

We conclude that it was not unreasonable for Berent to believe that Richards "had committed or was committing an offense" at the time of the arrest. *See Beck*, 379 U.S. at 91. By Richards's own account, when the officers came to the medical area, they immediately witnessed

some form of physical altercation between Richards and Paramedic Johnson. Even though it was Johnson who was restraining Richards, Berent still witnessed a uniformed medical professional struggling with or attempting to restrain a man who was pulling away. Michigan law permits an officer to arrest an individual for misdemeanor assault, which can be "either an attempt to commit a battery or an unlawful act which places another in reasonable apprehension of receiving an immediate battery." *Michigan v. Johnson*, 284 N.W.2d 718, 718 (Mich. 1979). Given the scene that Berent encountered—even as described by Richards—it was not unreasonable for him to have concluded that Richards, and not the uniformed paramedic, was the perpetrator of an alleged assault.

The district court's denial of summary judgment hinged on the fact that the source of the original request for police assistance was unknown. However, this is irrelevant to the probable-cause analysis. Regardless of *how* the officers were alerted, *what* they encountered upon their arrival in the medical area—a man in a physical struggle with a uniformed paramedic—is undisputed. That is enough to excuse any mistake by Berent, as being reasonable or at least not wholly unreasonable. We reverse the district court's denial of summary judgment for this count.

### B. Excessive Force (Count III)

As with the inquiry into probable cause, determining "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 398 (1989). Relevant are (1) "the severity of the crime at issue"; (2) "whether the suspect poses an immediate threat to the safety of the officers or others"; and (3) "whether [the suspect] is actively resisting arrest." *Id*. at 396. Ultimately, "[w]hether the force was excessive turns on its objective reasonableness under

the totality of the circumstances." *Id.* at 395–96. Because genuine disputes of fact exist as to some of the factors, we affirm the denial of qualified immunity for this count.

Richards says he was neither swinging at Johnson nor physically intimidating him when Berent entered the medical area. He was only attempting to pull away after Johnson had grabbed his arm and refused to let him leave. Berent also acknowledged that he did not order Richards and Johnson to desist before immediately moving in to subdue Richards. Richards did not continue to pose a threat *after* the officers arrived, but twenty-five seconds later he was on the ground with his head bleeding. A genuine dispute thus remains as to whether Richards was actively resisting. An officer's use of force is excessive when an arrestee is compliant. *Harris v. City of Circleville*, 583 F.3d 356, 366 (6th Cir. 2009) (denying qualified immunity when, in a nonthreatening situation, officers immediately took a man to the ground prior to issuing any verbal commands).

The situation in *Harris* is particularly illuminating. Officers arrested Harris after a traffic stop and took him to the Circleville City Jail. Inside the jail's "drunk tank," officers attempted to take Harris's jewelry and belt, which prompted Harris to step back and verbally object. Without warning or further instruction, the officers immediately "kicked Harris's leg out from under him and pushed him in the back, causing him to fall and hit his head." *Id*. at 366. Harris was then lifted back onto his feet and was led out to the booking area. An officer then instructed Harris to "kneel down" even though he could not physically comply as another officer was forcefully pulling up on his arms which had been handcuffed behind his back. Again, without further instruction, the officers used a takedown maneuver to take Harris to the ground. *Ibid.* Harris suffered a spinal-cord injury as a result. *Id.* at 362. Based on those facts we concluded that the officers were not entitled to qualified immunity from Harris's excessive-force claim.

8

Richards's situation is similar to Harris's in that it is disputed whether the officers in Richards's situation failed to issue any verbal commands before using strong physical force to subdue him. Richards says he was never told he was under arrest and there was not enough time for him to have resisted the officers as they immediately converged on him upon entering the medical area. Berent acknowledges that he did not order Richards to stop before moving in for the arrest; and while Berent stated that he told Richards to "stop resisting" several times before the officers took Richards to the ground, Richards denies this fact. Richards further testified that, while he was on the ground, he could not comply with any commands to place his hands behind his back as his arms were pinned beneath him. Our "prior opinions clearly establish that it is unreasonable to use significant force on a restrained subject, even if some level of passive resistance is presented." *Meirthew v. Amore*, 417 F. App'x 494, 499 (6th Cir. 2011). We have also repeatedly held that, "[t]he right to be free from excessive force during an arrest is clearly established." *Rudolph v. Babinec*, 939 F.3d 742, 752 (6th Cir. 2019). *See also Smoak v. Hall*, 460 F.3d 768, 784 (6th Cir. 2006); *Kostrzewa v. City of Troy*, 247 F.3d 633, 641 (6th Cir. 2001). Accordingly, we affirm the district court's denial of summary judgment on this count.

## C. Malicious Prosecution (Count IV)

Richards further asserts that Berent lied in his police report and at trial about witnessing Richards "pushing" Johnson, fueling an improper prosecution in retaliation for Richards's threat to sue the officers who had arrested him. To establish a malicious-prosecution claim, a plaintiff must demonstrate that: "(1) the defendant made, influenced, or participated in the decision to prosecute the plaintiff; (2) there was no probable cause for the criminal prosecution; (3) as a consequence of the legal proceedings, the plaintiff suffered a deprivation of liberty apart from the

initial arrest; and (4) the criminal proceeding was resolved in the plaintiff's favor." *Webb v. United States*, 789 F.3d 647, 659 (6th Cir. 2015).

Richards has not put forth evidence to create a genuine dispute over whether Berent "made, influenced, or participated in the decision to prosecute." We have held that "[t]o be liable for participating in the decision to prosecute, the officer must participate in a way that aids in the decision, as opposed to passively or neutrally participating." *Webb*, 789 F.3d at 660. The crux of Richards's claim is that Berent lied about his witnessing Richards push Paramedic Johnson. But Richards did not allege to the district court or here on appeal that Berent furthered the prosecution in any way beyond filing the initial police report and testifying at trial. Neither action is sufficient to defeat Berent's qualified immunity on this count. Testifying at trial can never be the basis of a malicious prosecution claim, as "a trial witness has absolute immunity with respect to *any* claim based on the witness' [sic] testimony." *Rehberg v. Paulk*, 566 U.S. 356, 367 (2012). Moreover, merely filing an allegedly misleading case report, without more active participation, qualifies only as "passive or neutral" participation and is thus an insufficient basis for a malicious-prosecution claim. In *Skousen v. Brighton High Sch.*, 305 F.3d 520 (6th Cir. 2002), the plaintiff asserted a malicious-prosecution claim against a state trooper who had submitted an investigatory report concerning allegations that the plaintiff had struck her daughter. From the record, it was undisputed that "after [defendant] turned in his investigative report [he] did nothing more than fingerprint [plaintiff] at the police station and testify at her trial." *Id.* at 525. Although the plaintiff alleged that there were deliberate lies and misrepresentations in the report, we held that because there was "no evidence that [the defendant] made or even was consulted with regard to the decision to prosecute," the defendant was entitled to qualified immunity. *Id.* at 529. Notably, as in the

present case, the district court in *Skousen* had denied summary judgment because discovery was not yet complete; nevertheless, we reversed. *Id.* at 522.

Cases after *Skousen* have continued to apply its holding that filing a case report, taken alone, is insufficient to support a malicious-prosecution claim. *See Miller v. Davis*, 653 F. App'x 448, 455–56 (6th Cir. 2016) (holding that a detective's report to prosecutors, even if "fundamental to the commencement of the criminal proceedings" was by-itself insufficient for a malicious-prosecution claim); *Kinkus v. Vill. of Yorkville*, 289 F. App'x. 86, 91 (6th Cir. 2008) (holding that an officer's actions of only filing a police report, signing a blank criminal complaint, and soliciting a written report from another officer was insufficient). We therefore hold that Berent is entitled to qualified immunity on Richards's Fourth Amendment malicious-prosecution claim.

### D. State-Law Claims (Counts II, V)

Richards also filed state-law claims for false arrest/imprisonment (count II) and malicious prosecution (count V). Berent asserted state-law immunity under Michigan law, which requires that he demonstrate: (1) the challenged acts were undertaken during the course of his employment and that he was acting, or reasonably believed that he was acting, within the scope of his authority; (2) the acts were undertaken in good faith and; (3) the acts were discretionary, as opposed to ministerial. *Odom v. Wayne County.*, 482 Mich. 459, 480 (Mich. 2008). Unlike federal § 1983 jurisprudence, "the burden continues to fall on the governmental employee to raise and prove his entitlement to immunity as an affirmative defense." *Id.* at 479. Although only the second factor is in dispute, the district court rejected Berent's claim of immunity as it held that, under Michigan law, a lack of good faith could be inferred from the lack of probable cause.

In *Odom*, the Michigan Supreme Court concluded that a lack of good faith requires the official to act "*maliciously* or with a *wanton or reckless disregard* of the rights of another." *Id.* at

474. So long as an officer "honestly believed he had probable cause to arrest, even if he later learned that he was mistaken," he is entitled to immunity. *Id.* at 481. Furthermore, *Odom* held that "a claim of false arrest or false imprisonment cannot be sustained if the arrest was legal." *Ibid.* We have held that Berent was not unreasonable in arresting Richards. That demonstrates a lack of subjective malice or wonton recklessness and is therefore enough to grant Berent governmental immunity for the state false-arrest claim.

As to the malicious-prosecution claim, Richards is required to show that Berent "instituted or maintained the prosecution." *Matthews v. Blue Cross and Blue Shield of Michigan*, 456 Mich. 365, 379 (Mich. 1998). The discussion in the preceding section demonstrates that there is not enough evidence for a reasonable jury to conclude that Berent instituted or maintained the prosecution. We thus reverse the district court's denial of state-law immunity for these counts.

## IV. Conclusion

For the foregoing reasons, we **AFFIRM** the district court's denial of qualified immunity for Richards's excessive-force claim but **REVERSE** the district court's denial of qualified immunity for the false-arrest and malicious-prosecution claims, and their state-law counterparts. Berent is therefore entitled to summary judgment for counts I, II, IV, and V.